Good morning. Counsel, help me with your last name. I want to get it right. It's Ferjoel, your honor. I'm not very sensitive. You know, my children are in their 40s and don't know how to pronounce it. So, thanks for your help and welcome and you may proceed. Thank you, your honor. Well, as I said, my name is Sam Ferjoel. May it please the court, I represent Brandy Calhoun, who is the plaintiff and appellant in this matter. It's a disability case, of course. Ms. Calhoun is 30 years old. She was 23 when she applied for supplemental security income in 2019. 26 years old and still living with her parents when she had her hearing in 2022. She's never lived alone. She graduated from high school, but she received special education services in the form of extra time on tests. She was tested in separate rooms and she had to have the tests read to her. She reported or her father reported that she had particular problems with math and reading. She tried to attend a cosmetology program, but she dropped out because she suffered panic attacks just having to go in. She's never worked. The record shows also that she did not have health insurance during the pendency of her claim. I'm going to try to address three issues today in the case. First is what I guess is an implicit finding by the administrative law judge that Ms. Calhoun could actually attend work despite agoraphobia and that's related to the judge's rejection of consulting psychological evaluation by Dr. Broman folks. Second, I wanted to talk about the inadequacy of the ALJ's determination that she could essentially be on her feet all day given her obesity and her leg problems. And then last, I've briefed it and I want to address the treatment by the ALJ that she was a high school graduate. Ms. Calhoun was diagnosed with agoraphobia about a year before she applied for disability by her primary care physician, Dr. Baker. The consulting evaluator, Dr. Broman folks, also diagnosed agoraphobia. She testified that she was never comfortable leaving home at all, but if she did leave home, she always had to have somebody with her. And that actually, there's some proof of that in the record because at virtually every primary care visit, it's not always reported, but most of the time it's reported that she had either her mother or father with her. She testified, in fact, that she couldn't even go to the examining rooms without one of them being with her. The ALJ herself found that agoraphobia was a severe condition, but she rejected the consulting psychologist evaluation. He had said that she would not be able to perform activities that required her to leave home on a regular basis. The commissioner has conceded, although the ALJ never actually addressed this directly in her decision, that Ms. Calhoun could regularly attend work. So Dr. Broman folks had several observations, not just that. He also gave the opinion that she appeared to be relatively low intellectual functioning, that she had very limited coping strategies. And he said that she was severely impaired when it came to her abilities to relate to others and to withstand the stress and pressures of day-to-day work activity. Counsel, can I just ask you, I just want to make sure I'm tracking where we are in the argument. So Dr. Broman folks does say, because of the agoraphobia, she can't regularly leave home, at least not on her own. And the ALJ discredited that, I think on three grounds, thought that it was inconsistent with her primary care records, which didn't indicate kind of a severe mental concern. It was inconsistent with the fact that she had not sought mental health treatment for agoraphobia, and it was inconsistent with her hobbies. Do you want to kind of address, where do you think the ALJ went wrong in that analysis, I guess would be my question. To a certain extent, Your Honor, all three of those bases. I mean, she really said one thing, the ALJ said, well, it's inconsistent. And those were the things you recited were indeed the examples that she gave. First of all, I mean, almost all the primary care visits were for acute physical problems. So it's not surprising that that would not be the focus of those visits. The ALJ continually meant she talked about the normal mental status examinations, but a number of those, as I tried to detail in my brief, were inconsistent. So they had a template that said, oh, normal, normal, normal. But there were times that there were observations made that correspond with the agoraphobia, and the ALJ didn't mention these. For example, in one of the visits, it recited that when Ms. Calhoun was questioned, she turned to her mother to answer. She didn't answer directly unless she was kind of asked to answer directly, and then I guess she did. So the mental health, the fact that there are mental status examinations in primary care visits that do not regularly reflect abnormalities, I don't know how that speaks to agoraphobia, but I think the larger point as to Broman Folks is, he knew that. This was all reported to him. It was also reported to him about her hobbies, which, I mean, I'm scratching my head about those, Your Honor, because those hobbies were, for the most part, pursued in her room, in her parents' house, how that shows that she doesn't suffer from agoraphobia. What about going to the concert? Well, that's the big thing that the ALJ recited over and over again. That was a week after, according to the record. That information came from an emergency room record. There was no detail about what that concert was. Was this a... Can you just help me, though? I mean, I understand the sort of argument that you're making on a lot of these points to say, well, maybe you should have believed this part of the record and not that part of the record. Maybe this was not reliable or not, but our standard review doesn't allow us to really do that, does it? I mean, if there's some evidence in the record, maybe it wouldn't be the conclusion I would come to, but if there's some evidence in the record that the primary medical records don't support this sort of mental health problem, and there's some evidence in the record that some of her hobbies involved outside engagement in crowds, how are we supposed to re-evaluate that? With due respect, Your Honor, the court... This isn't really a substantial evidence case. I guess in a sense, every case is, but you've also said, and the court has repeatedly said, there has to be logic to the conclusions ALJ draws, and they have to be accurate, and there is no logic to saying that a person isn't agoraphobic when, number one, the activities that she cites for the showing that she's not agoraphobic are things that she does in her room, you know, painting in a room or taking care of her pet duck. But also the things that are recorded by her primary doctors. Those aren't in her room, right? The concert's not in her room. I mean, I understand your argument, but I feel like the standard of review, I'm having a little hard time understanding how your distinctions, which I totally understand, help in evaluating whether the ALJ so drastically departed that we have to vacate it. Well, thank you, Your Honor. You know, the concert is the one example. I guess that's a big troubling example, but there's no information about that. And first of all, we don't even know what this is. She called it a concert, but we don't know if this was something in the basement of her church. She was sitting, we don't know who was with her, but there's an indication in the emergency room records that probably her mother was with her or somebody was with her in any case. She didn't say she could never leave home. She said she was uncomfortable leaving home. That concert, the single time that she was out and she hurt herself, that doesn't prove anything. She was with somebody. She said that if she left the house, she could do it if she had somebody with her. And the record shows that. Her father was taking her to see the friend that the ALJ cited that she would see on a monthly basis. She always had somebody with her. That is confirmed in the primary care records, and there is nothing. It's a difference between an absence of evidence, I guess, in the primary care records and conflicts. I don't see a single conflict in the primary care records. There's nothing in those records to suggest that she is mentally sound or intellectually sound. At most, they don't record anything. I mean, she goes in because she has digestive problems and they don't mention her psychiatric care. I don't think that proves anything. I don't think it's substandard that that would happen. Counselor, can I ask you just a question that I guess goes to our standard of review to some extent? So the ALJ gave these three examples of inconsistencies. Assume hypothetically, I found one or two of them illogical. Would I then... And let's also assume I thought one of them made perfect sense. Then what do I do? If one of them makes sense, is that enough? Or do I have to remand because I honestly don't know how the ALJ would have come out had I pulled out two of the three underpinnings for this conclusion? Well, I would obviously prefer the latter. But do you know what the right answer is? Because honestly, I don't. Well, I think that if this were a question of discrediting what Ms. Calhoun said, that would be one thing. But that's not what we're dealing with here. What we're dealing with is a very favorable consultative evaluation, which shows severe impairment. The information that has been cited and Judge Richardson mentioned, that was all in front. The only thing that was not in front of the consulting psychologist, who's an expert, and I mean, I gave some citations. He's been appearing, he's cited in district court decisions going back 10 or more years. He knew all those things. So, I mean, to me, if the ALJ then takes the same information that the psychologist had in front of him, her hobbies, the fact that she visited her friend, and he still says, hey, she cannot attend regularly if she has to leave home to do it, then I think you have to remand because it's the consulting psychologist evaluation that got thrown out. If that were rejecting that were valid, I think that would be a different thing. But I think that if there was any invalidity in her very skimpy rejection of the consultative evaluation, where he had that information, then I think that that causes the whole kind of house of cards to collapse. Can I ask you a question about a different issue? I think it was the second one you were going to address. You had the two state experts saying that Ms. Calhoun can stand for four hours and do sedentary work, and then the ALJ saying, no, she can stand for six hours and do light work. And you argue that there's not enough of a bridge there, not enough of an explanation for rejecting the kind of unanimous view of these two experts. Your colleague at least suggests in the brief, even if that's so, it's a harmless error because even if she can only stand for four hours, some of the jobs identified by the vocational expert would still be available. And I'm not sure, I actually don't think the ALJ kind of clocked the difference between sedentary and light, but even if, let's assume we're just talking about the hours for a minute, do you have a response to that harmless error analysis? Well, it's true that the ALJ did float to the vocational expert about the possible reduction. I think that's accurate. So, I mean, I would concede that what the government said is true, that the VE named the one job that could still supposedly be performed without, but none of, I mean, even that doesn't make sense. I mean, the ALJ said that she found persuasive all of the state agency reviewers. There was a total mismatch between the two psychological reviewers. I mean, complete mismatch. How she came to that makes no sense. In terms of the physical complaints, I don't know. Well, I can't, I don't know how to answer it, Your Honor. I don't have a good answer for it. I mean, frankly, we don't believe that the four hours a day is enough of a restriction because the testimony, I believe, was credible that she had to alternate between sitting and standing on a fairly frequent basis. The ALJ didn't even deal with that at all. So, if the, I think maybe an answer is if you have to alternate between sitting and standing because you can't stand the whole day to do the light work, then there is, there has to be some interval in which the person changes between sitting and standing. But, but, Your Honor. Can I ask you a maybe related question? At J697, which are part of her medical records, the medical records report, at least at this time in 2015, which is not when we're talking about, but she described standing at school for eight hours a day. What do we do with that? You know, piece of information, right? We know she was in school through 2017. This suggests that she was standing, you know, I don't know whether it's right or not, but at least the record says it. I don't know what, what am I, am I supposed to do anything with that? Or do I just ignore that? Like, it seems like an odd, like, piece of information given the issue that we're talking about here. I just am curious what your take is. Well, first of all, the ALJ prevented us from putting on evidence about the pre-application time period. She said, oh, well, that's for historical purposes only. And she interfered with the questioning. She didn't want to hear that evidence. You know, I don't have an answer for the 2015. I have no idea what was going on then. We know that she injured her knee at that concert, the 2019 concert a week after she applied. But she was, this is somebody who weighed almost 400 pounds. At times, she weighed over 400 pounds on a 5'3 frame. I mean, a BMI of over 70 at times, the high 60s almost all the time in this record. The, again, it's a question of logic. Can a person, she testified that she could not be on her feet continuously at the hearing. So, I mean, that's, that's what I have to go on, Your Honor. I don't really have an answer about what was happening in 2015. I really don't know. I don't think the record reflects it. But the ALJ herself said it didn't matter. So, I mean, I think you have to take her at her word. I mean, this is four years after the, any 2015 report. I mean, you know, she also, the ALJ played down. I mean, she, there's an MRI. I see I'm about to run out of time here. But, I mean, there's an MRI, and I can't give you the site off the top of my head. I'm sorry. I have it written down, but I don't know where. The, there was an MRI that showed many more problems with her knee, just the knee, than what the judge said. And the judge found the knee was a severe impairment, by the way, as was obesity. So, I mean, if it's, if it's severe, then it has a significant or causes significant limitations by definition. She, she minimized that. So, thank you. I'm sorry. I see that I'm out of time. So, I apologize. Thank you. Thank you, counsel. Ms. Domenico. Good morning. May it please the court. Ms. Calhoun hasn't shown any legal error or that the ALJ's decision is unsupported by substantial evidence. What she's asking this court to do is to reweigh the evidence and interpret it in her favor. And that's just not the court's role on judicial review. What the ALJ did in this case was she followed the law, she weighed the competing evidence, and she issued a decision with sufficient rationale pointing to substantial evidence as to how and why she reached her conclusion. I'll start with the CE, the evaluation of the CE. First, that consultative examiner who only examined Ms. Calhoun once didn't have the entire record like the ALJ did. This consultative examiner didn't know that just months before Ms. Calhoun had attended a concert, even though she said she rarely left her house. He also didn't know that Ms. Calhoun... Can I just stop you right there? There's actually no inconsistency in those two things you said. She said she rarely leaves her house, and she has extreme discomfort about leaving by herself. And that's not a however. One of the rare occasions was when apparently with someone else, she went to a concert. So what's the inconsistency there? Well, I think that she didn't tell the consultative examiner that fact. He didn't have that fact. Okay. Right. So he didn't know necessarily the full picture. This young woman also applied for bartending positions and stocking positions during the relevant period. So that says something about the extent of her limitations if she's trying to apply for bartending, which is very socially interactive. But beyond that, the ALJ, when she looked at the CE exam, had the benefit of seeing the state agency doctors who had also reviewed this report and found that Ms. Calhoun retained mental health, mental functional abilities. The ALJ had the benefit of looking at her primary care records. Now, while Ms. Calhoun tries to discount the value of those records, these are the providers that were prescribing her medications for agoraphobia and anxiety. These were the people that she treated with because she declined talk therapy. She didn't have specialized mental health treatment. Can I ask you a question? Because I think we should probably stick with sort of the reasons the ALJ gave for discrediting or discounting this report. And two of the reasons are what you just put into one side, the hobbies. The other two reasons were the ones you just gave, you know, her primary care physicians were documenting mostly normal mental status, and she didn't seek out additional treatment for agoraphobia. And I will tell you that my concern is I think it's pretty clear. I think agoraphobia is a tricky one. And I think it is pretty clear that an ALJ is supposed to consider whether a claimant is making behavioral modifications that make it unnecessary to get additional treatment and that might allow that person to present with normal mental status. So basically, if an agoraphobic is staying home and not leaving home without someone with her, you would actually expect her to have relatively normal mental status. She's not doing the thing that causes anxiety. And that may be why she doesn't feel the need to get additional treatment for the agoraphobia. And I know that, I mean, an ALJ is supposed to consider whether a claimant's own behavioral modifications account for things like normal mental status and failure to get additional treatment. And I just didn't see that happen here. So that's my concern. Well, Your Honor, if you look at the primary care treatment records, Ms. Calhoun did talk about a situational stressor. So she reported increased symptoms after a friend died of COVID. And she actually talked to her primary care providers about that. And I think that that informed the ALJ that when she had increased symptoms, she was willing to talk to her primary care providers about it. But for the most part, she wasn't doing that. Because she didn't have the increased symptoms because she was staying home. Like, I'm not sure that that is really responsive to the concern I'm raising. And I do think agoraphobia, this is the first agoraphobia SSA case I've seen, it does seem to present very sharply this idea that there are certain mental conditions where you can make behavioral modifications that will bring down, for the most part, the level of mental disturbance, and also make it unnecessary to seek treatment, particularly treatment that requires you to leave your home and be with a group of people. People might make a choice to modify their behavior. And that doesn't end the inquiry, but it is something an ALJ is supposed to consider. I can't remember the name of the, I know there's like a bulletin or something that says ALJs need to consider this. So do I not need to worry that that didn't happen here? I think that if you look at the entire decision, and what the ALJ explained as the basis for her fact-finding, that is enough. This is a young woman who declined talk therapy. She did say that she was anxious in a group therapy setting. But this is in the era, the height of COVID. Certainly, she could have tried to seek treatment to work through her agoraphobia, at least through talk therapy from home, through telehealth. And she didn't do that. And claimants have to help themselves a little bit as well. They have to seek the treatment that they need. And the record also showed that she applied for bartending positions, stocking positions. She did go to the YMCA for water aerobics. She did leave the home to go to all these primary care visits. And yes, she was accompanied by a parent, but this is a young who never had a driver's license. So I mean, that's also, I mean, the ALJ did say that, you know, she didn't have, she needed a ride to these appointments. But what the ALJ did here is, and the question before the court always is, is there the mere scintilla of evidence to support the ALJ's fact-finding? And we have that here. The ALJ identified various lines of evidence, the lack of specialized mental health treatment, and she was not going, she never sought emergency room care. Again, we have those two state agency medical experts, and we do have her activities. And is that enough? And even if this court would disagree, that's not what the issue is. Could a reasonable mind find, as the ALJ did here, and our position is yes. Can I ask you another question about how the ALJ got from these two agency experts who agree that Ms. Calhoun can only do sedentary work and she can only stand for four hours, no more than four hours a day, to actually she can do light work and she can stand for six hours a day. And I know she does talk about the knee pain, but the ALJ just seems to be of the view, she disagrees with the doctors about how serious the knee pain is. And I'm not sure what the basis is for an ALJ kind of just making a different medical diagnosis, but she doesn't mention the other primary basis for the doctor's analysis, which is the neuropathy. And I didn't see the ALJ acknowledging a difference between sedentary and light work. So I'm troubled that we don't have a bridge here that kind of explains how the ALJ got from four hours sedentary to six hours light. And I want to give you a chance to explain to me where I should find that bridge. Certainly, Your Honor. Well, at the outset, I don't believe that the state agency's RFC was for sedentary. It's a range of light because of the lifting and carrying requirements, it's 20. And the vocational expert also categorized four hours as light. So if you look on page 70 of the transcript, when the ALJ asked the VE about four hours standing and walking, the VE confirmed that that's light. So the ALJ really agreed with the state agency, except for the reduced standing and walking. And as you pointed out with my opposing counsel, the VE confirmed that at least two jobs existing in 130,000 positions in the national economy could be performed with reduced standing and walking. And the VE goes on even to testify that if you look on page 74, that these are even able to be performed with a sit-stand option at will. So that's even more restrictive, and they could still be performed if she needed to sit or stand about 15 minutes at a time. So that supports this non-disability finding. All right. So I just want to make sure I understand your argument. So I asked you, where is the bridge? Okay. And I'm understanding your answer to be, don't worry about whether there's a bridge, because even if there is no bridge, it doesn't matter. This was a harmless error. So is that the argument you're making? No. And then I will point out the bridge as well. So on page 25 of the ALJ's decision, the ALJ explains precisely why she does not accept the standing and walking of the state agency. And she cites to the longitudinal records with few abnormalities, fairly minimal treatment, and she didn't report consistent ongoing pain and actually described her pain as waxing and waning on one occasion. So despite her obesity, these fairly minimal objective findings support a finding of the standing and walking. And that's the precise bridge that the ALJ included in the decision to explain why her RFC differed a little bit from the state agency. But my second argument is that it doesn't matter anyway, because this VE confirmed that the jobs could be performed. No other treating sources suggested that Ms. Calhoun had greater limitations stemming from obesity, knee pain, anything else. So the ALJ, our position, of course, is that she identified that bridge right in the decision for the reviewing court. Counsel, my question to you is that a person with this constellation of problems, for example, hypertension, pain in her legs, anxiety, panic attacks, knee problems, and you can imagine, as counsel said, he's right about her weight, she's morbidly obese, morbid. And we don't need, I know you exactly what morbid is. I mean, that's about as severe as you can get. And you can imagine, whether you're a football fan or not, but you can imagine that one of the biggest linemen you can imagine that was normally about six, six, six, seven, take that weight and put it on a body that's five foot three with a person who has a knee problem. Matter of fact, a weight so severe that it's undisputed, correct? She needs knee surgery, but she weighs too much to get the surgery that she needs. The surgery that she needs. She talks about numbness when she sits down. Where is the, again, I don't want to, you've answered the question for Judge Harris, but the bridge, I don't see how this kind of thing would lead to, oh, well, with six or four, she can do it all. And she goes to one concert in 26 years. My goodness, I don't understand that. We don't know what the concert was. As counsel said, maybe it was a concert. You know, when I was going to church, a little small church, we called it a concert when two or three choirs got together at the church. But now I guess the image is what has got to be a thousands of people there. How do we leap to that? That's the problem we're looking at. How do you take this constellation of undisputed, severe, morbid situations like this and then say, well, yeah, you know, she can just walk around. Walking is hard for her. It has to be. Well, Your Honor, that doesn't, it's not borne out in the record. That's the issue here. She was walking unassisted at her primary care visit. She had a normal gait and her primary care providers were documenting fairly unremarkable musculoskeletal neurological findings. You know, it is the burden of claimants to show that they are so debilitated that they can't perform any kind of work existing in the national economy. And this young woman who was just 23 when she applied for benefits and has never tried working doesn't have, yeah, doesn't have that much evidence here showing that she's so debilitated. She's saying she is, but she applied for bartending positions and stocking positions. Those are physically demanding jobs. She attended a water aerobics. She wasn't complaining that much of significant symptoms. In fact, the primary care records reflect that most of her appointments were for infected piercings and treatment of keloid scars. This isn't the kind of person who was going to the doctor complaining of inability to walk every time she saw her primary care provider. Yeah, so Kelsey, interesting, you know, not putting yourself personally, but the point is that when you talk about people who have so much pain and they don't, to the point where they don't continue to complain about it. I mean, some serious pains. And so you say, well, you can't be in pain because every day you're not moaning about it. No, in some way you had to find a way to suffer through it. But the physical evidence here in terms of just her knee alone and that kind of weight, putting that much weight on your knee that you need surgery for, you know, doc, she tried, she tried to lose some weight. And these jobs you're talking about, talking about catch 22. Well, if you didn't apply, you see, she never tried to get a job. But if you do apply, look, she's applying for jobs. She knew she couldn't, you know, nobody wants to give their life up at 23 years old. It's agoraphobia, those kinds of things, like telling somebody who's depressed, cheer up. Because they can't cheer up. And it just seems to me that this is, this case here is, it's incredibly troubling, you know, that these undisputed situations like this that we are talking about residual functioning that's inconsistent with the whole gamut of what's presented. But I suppose you can always say, like you said, you know, you went to a concert, you're not complaining every day. People going through some sometimes serious chemotherapy, very painful, but they don't, they don't complain, because somehow they find a way mentally to try to get through it. But that doesn't mean that they're not. And you take all of those things, you see, not you personally, but the record people who look at those things and have make some judgment about the nuances of human experience, and come up with this, it just seems troubling. Go ahead. Well, I would just say to that, Your Honor, that the ALJ is the fact finder in the case. And under you know, they the ALJ has to weigh the competing evidence. And under our substantial evidence standard, if there is more than a mere scintilla, and less than a preponderance, the Supreme Court has said, it's a not high standard. And we certainly have that here. So as you read the ALJ opinion, is the ALJ basically saying like, I don't believe you, you say you're agoraphobic, I don't believe you, you went to a concert, you applied for jobs. And like you feed your duck some other stuff that the ALJ thought was inconsistent with agoraphobia. Is that your understanding? Like this is a credibility determination by the ALJ that this woman is not agoraphobic, obviously, she left the house to go to a concert. No, because the ALJ credited agoraphobia as one of our severe conditions. So what I think is that the ALJ didn't agree that her agoraphobia was so limiting, that she couldn't leave the house every single day. I don't what does it mean to have agoraphobia? But you can leave the house every day on a company to go to work. I don't know how is that consistent? I have really struggled with this. And I know that she credited it. But I know that she says, I believe you have agoraphobia. But I don't see how that can be consistent with saying, I also think you can leave the house every day and go to work by yourself. Well, under that rationale, Your Honor, though, anybody who had agoraphobia and said they had a diagnosis of agoraphobia could be found disabled. And under our rules, we have to produce evidence that shows they are so functionally limiting. And what they she did here is not produce that evidence. And it was a reasonable determination. We don't you are not on. Yes, I will confess, I don't know a ton about agoraphobia. But is there reason to think that it's like depression? I mean, some people have depression and they are incapable of functioning. And some people have depression at a much less severe level. And so to say that someone is has a diagnosis of depression is really only the first step in the question. You could have it to such a degree that it was debilitating. But you could also have it to such a degree that it is like debilitating. Lots of people that like function in society have depression at some degree and it's managed or not managed. Or, you know, as Judge Gregory mentioned, sometimes people just suck it up and deal with their problems. Is there reason to think that agoraphobia is different than what I would say sort of my common knowledge of mental health challenges is? Is it OK if I see I'm over? I'm going to be happy for you to. OK, I think that, you know, it's not based on a diagnosis. There could be varying degrees of agoraphobia here. The claimant actually reported an improvement with her agoraphobia, told her primary care doctors that the medication was effective. She stayed on the same medication for years at a time with not a lot of changes. So like other mental health illnesses, there could be varying degrees. Certainly there could be somebody that shows this, you know, this court that they really, truly never leave their house and they're so panicked. But we just didn't have that here. We had somebody who reported improvement in her anxiety with her medications. She was leaving her house and all the other stuff I've told you, you know, prior to this. And the ALJ looked at all of that as a reasonable fact finder. And that's why we asked this court to affirm. Thank you, counsel. You have some time reserved. Thank you, Your Honor. I do want to respond to a few of the points that were made. First of all, the whole, the issue about, well, counsel for the commissioner said that, well, she went to her doctor's appointments, her primary care visit. So that shows that she could leave the house. But she never said she couldn't leave the house. She said she couldn't leave the house without somebody with her. But I want to go back to Dr. Broman-Folkes, the consultant. He didn't know maybe about, he didn't have her primary care records. I'll concede that. But he and it's in his report that she left the home to go visit a friend monthly, accompanied by her father. He was aware of that. He also, and he was aware that she wasn't just closed up in her bedroom. So this, I don't, I don't have any doubt that an ALJ, like I have literally no doubt at all. In fact, if I was the ALJ, I would probably find that this woman was, was disabled. Right. But, but that's not the question, right? I mean, I, I understand how your doctor came to the conclusion. The challenge I've got is like, there is some evidence on the other side of this, that, that is a little hard for me to get my head around how I just sort of say like, yeah, I think I got a better handle on this than the ALJ. Well, I'm not saying that I have a better handle, your honor. I'm saying that the consultative psychologist who's an expert in the field did, you know, one of the things that I found amazing here in the, in the decision was the ALJ said that she found persuasive the two state agency psychologists who did not meet, or the psychological experts who did not meet with Ms. Calhoun, but just reviewed the records. Their reviews were two months apart, a total mismatch between their records, but she said they were persuasive. But the one that she said that was the most persuasive was Dr. Harrison. So Dr. Harrison, if you look at her report, says that Dr. Broman-Folkes, the person who met with her, who is their consultant, not mine, it's not Ms. Calhoun's, it's the person they sent her to, that, that his evaluation was completely consistent. She said, Harrison said it was completely consistent with the evidence of record. So the ALJ who said that she was persuasive found that, that she was persuasive, but Broman-Folkes wasn't, even though Harrison said he was, you know, I mean, it's, it's a, it's a trap, I guess. I want to address a few things in my last few seconds here. Like in terms of logic, is it logical to say that a person who goes to aquatic therapy doesn't have leg problems? I mean, that makes no sense. Ms. Calhoun said she went five times, by the way. So over two years, she attended five times the aquatic therapy. The definition of agoraphobia, which I think has been talked about a lot here, and I, and I, I agree. I mean, if it's a severe impairment, then it significantly limits her. So what is the significant limitation of agoraphobia if it's not that she can't leave her house? Thank you very much. I'm sorry, my time's up, sorry. Thank you both. Well, unfortunately can't come down, I'm normal, accustomed to the greet you and handshake, but know that the virtual one is just.
judges: Roger L. Gregory, Pamela A. Harris, Julius N. Richardson